# **A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF CABELL, to-wit:

I, Adam Bennett, being first duly sworn, do hereby depose and state as follows:

1. I make this affidavit in support of an application for a search warrant to search the residence located at 243 West 8th Avenue, Apartment 7, Huntington, West Virginia, 25701 (hereinafter the "SUBJECT PREMISES") used by HAKEEM MACK (hereinafter "MACK") who is a participant in a drug trafficking organization (hereinafter "DTO") responsible for the trafficking of methamphetamine in this district. As set forth herein, probable cause exists that MACK and other members of the DTO have engaged in an ongoing, continuous course of conduct involving the distribution of, and possession with intent to distribute, controlled substances in violation of 21 U.S.C. § 841(a)(1), and a conspiracy to commit those offenses in violation of 21 U.S.C. § 846 (hereinafter the "SUBJECT OFFENSES"). Further, probable cause exists that evidence, proceeds, and fruits and instrumentalities of those offenses are located within the SUBJECT PREMISES more particularly described in ATTACHMENT A.

2. I am a Special Agent (SA) of the Federal Bureau of Investigation (hereinafter "FBI") and have been so employed since March 2012. I am currently assigned to the FBI office in

Huntington, West Virginia. I completed five months of training at the FBI Academy in Quantico, Virginia, where I learned the skills necessary to conduct federal criminal investigations, including investigating crime scenes, interviewing witnesses and suspects, and writing reports and affidavits. I have also received specialized training, including the Department of Justice Asset Forfeiture and Money Laundering Section (AFMLS) Financial Investigations Seminar, as well as the AFMLS Basic Organized Crime Drug Enforcement Task Force Financial Investigations Seminar. I have experience investigating complex drug trafficking organizations, firearm violations, bank robberies, and child exploitation, as well as other violations of federal law. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

3. I have obtained the facts set forth in this Affidavit through my personal participation in the investigation, from oral and written reports of other law enforcement officers, from records, documents and other evidence obtained during this investigation, and from other sources of information as referenced herein. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

**PROBABLE CAUSE**

**A.    Background of the Investigation**

4.    The FBI is currently conducting a criminal investigation of DERRELL MASSEY (hereinafter "MASSEY") and others participating in an extensive DTO involved in the commission of the SUBJECT OFFENSES. MASSEY and other individuals, both known and unknown to investigators at this time, frequently obtain large quantities of methamphetamine from one or more sources and distribute those drugs in and around Huntington and other locations within the Southern District of West Virginia. There are numerous participants in the DTO including, but not limited to, MACK. The DTO participants are predominantly supplied by MASSEY and have their own customers that they in turn supply with controlled substances. Over the course of the investigation, numerous investigative techniques have been used including Title III interceptions and controlled purchases of controlled substances.

5.    Since February of 2023, there have been over twenty controlled purchases of controlled substances from MASSEY or one of the DTO members, including numerous purchases from MACK. All the controlled purchases were conducted by various Confidential Human Sources (hereinafter "CHS"), all of whom have been assessed to be reliable and have provided corroborated information regarding drug trafficking in this district.

6. From August to November 2023, investigators have intercepted communications to and from multiple TARGET TELEPHONES used by MASSEY and others pursuant to authorization by Chief United States District Judge Thomas E. Johnston (hereinafter "Chief Judge Johnston"). In total, six telephones used by the DTO have been monitored. In various authorization Orders, Chief Judge Johnston found probable cause that particular wire and electronic communications of multiple persons, known and unknown, including MASSEY and MACK would be obtained through the interceptions requested. The Orders further found that the intercepted communications of those individuals would concern specifics of the target offenses listed in the application including the distribution and possession with intent to district controlled substances in violation of 21 U.S.C. § 841(a)(1) and a conspiracy to commit those offenses in violation of 21 U.S.C. § 846.

7. During the period of interceptions, pertinent calls were intercepted over the target telephones establishing that MASSEY and the DTO are involved in the distribution of large quantities of methamphetamine in and around Huntington and other locations within the Southern District of West Virginia. Physical surveillance and other investigative techniques, taken in conjunction with these interceptions, have revealed that the DTO

utilizes numerous residences in the Southern District of West Virginia to store, process, and distribute controlled substances.

**B.   The DTO's Use of the SUBJECT PREMISES**

8.   During the investigation, I have learned that MACK is utilizing the SUBJECT PREMISES to facilitate the commission of the SUBJECT OFFENSES.

9.   Throughout the investigation, investigators have observed MACK at the SUBJECT PREMISES on numerous occasions. Investigators have also conducted multiple controlled purchases of methamphetamine from MACK, including a purchase at the SUBJECT PREMISES.

10.   On June 28, 2023, investigators utilized a CHS to conduct the aforementioned controlled purchase operation on MACK. On that date, investigators met with the CHS where a search of the CHS was conducted and no contraband was located. The CHS and an undercover officer (hereinafter "UC") traveled to Huntington and contacted MACK via FaceTime to arrange the transaction. After locating MACK, who was operating a blue Chrysler 300, MACK directed the CHS and UC to follow him in the UC vehicle. MACK, the CHS, and the UC subsequently traveled to the area of the SUBJECT PREMISES. MACK and the CHS then entered the SUBJECT PREMISES together. While inside, MACK distributed methamphetamine to the CHS. The CHS exited the SUBJECT PREMISES and returned to the UC vehicle. The

5

CHS and the UC then traveled to a predetermined location and the CHS provided the methamphetamine to investigators. The methamphetamine weighed approximately 283 grams and field tested positive for the presence of methamphetamine. The CHS stated that during the transaction, the CHS observed approximately two additional pounds of methamphetamine in the SUBJECT PREMISES.

11. On November 8, 2023, a federal grand jury in Huntington, West Virginia returned an indictment charging twenty-seven (27) defendants, including MACK, with various drug trafficking offenses and arrest warrants were issued for each defendant. Count One charged MACK with conspiracy to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 846. Counts Fifteen, Twenty, and Twenty-Six charged MACK with distributing methamphetamine on separate occasions, all in violation of 21 U.S.C. § 841(a)(1).

12. On November 15, 2023, investigators executed the arrest warrant for MACK at the SUBJECT PREMISES. When investigators gained entry to the SUBJECT PREMISES, they observed multiple items in plain view. Specifically, investigators observed a revolver laying on a couch, a jar containing what appeared to be rolled marijuana, and a large sum of U.S. currency with a wallet on a table. MACK has multiple prior felony convictions, including a conviction for possession with intent to distribute a controlled substance and is prohibited from possessing firearms.

13. In addition, based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

    a. Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing, and manufacturing controlled substances.

    b. Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities, and telephone numbers of suppliers, customers, and co-conspirators.

c. Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences.

d. Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits. In order to do this, traffickers frequently attempt to secrete, transfer, and conceal the money by means, including, but not limited to: placing assets in the names other rather than their own to avoid detection while maintaining control; laundering the money through what appears to be a legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets that are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

e. Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residences which were generated

by their trafficking activities or purchased with the cash earned from such trafficking.

f. Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms, and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

g. Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owing, frequenting, or controlling the residences and premises.

h. Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i. Individuals involved in narcotics trafficking often utilize radio scanners, police radios, and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j. Individuals involved in narcotics trafficking often maintain photographs and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

**CONCLUSION**

14. Based on the above-stated information, probable cause exists that MACK and other members of the DTO have been, and are, engaged in an ongoing, continuous course of conduct involving the commission of the SUBJECT OFFENSES. I further submit that probable cause exists that evidence of the SUBJECT OFFENSES, fruits of the SUBJECT OFFENSES, and property designed for use, intended for use, or used to commit the SUBJECT OFFENSES are currently located at the SUBJECT PREMISES as more fully described in Attachment A.

Further your Affiant sayeth naught.

_____
ADAM BENNETT, SPECIAL AGENT
Federal Bureau of Investigation


SUBSCRIBED AND SWORN before me this 15th day of November, 2023.

_____
HONORABLE CHERYL A. EIFERT
United States Magistrate Judge

11